Good morning, Your Honor. Stephen Barth, Federal Defenders, on behalf of the defendant appellant, Mr. De La Mora-Arvide. At the outset, I would like the Court to note I will be reserving approximately a minute to two minutes for rebuttal. You have to watch the clock, so self-monitor. It's right in front of you. You don't have to worry about that. Thank you, Your Honor. It's digital. Perfect. May it please the Court. Your Honor, in this case, the district court was correct in determining, holding that this was a non-routine search. The reason for that is because Melina Terrazon, the president of Melina Terrazon, in this case, controls. What we have here is the removal, using a screwdriver, of the protective plate over the sending unit, which rests in the gas tank. The area of the car, which, of course, holds highly flammable, potentially explosive gasoline. Now, did the district court find that it was non-routine? Or did it simply say that it didn't have to decide that because it was clear that there was reasonable suspicion? No, I believe, Your Honor, that the district court did hold that it was non-routine. I don't have the page or the excerpt of the record in front of me. But I think I'm incorrect. I thought the government agreed with me on that. She says at the beginning there was an additional evidentiary hearing in which case, at which time the district court found that this was not the bread and butter type of case that it normally sees before it. And therefore, the search was non-routine. I think the excerpt of the record, 170. I think that's correct. The way I read this is that the district court did not rule on whether the search was routine or non-routine, but said that's moot because reasonable suspicion existed. Your Honor. I can be corrected if I misread that. I believe, actually, and I could be mistaken, that the district court did rule that it was non-routine. There was, I believe, a finding that this was not the type of case. However, because there was reasonable suspicion based on the Court's analysis that it did not need to, perhaps what you're saying is that it need not rule one way or the other. If that's the case, Your Honor, nevertheless, I believe that this case is clearly a non-routine search. As I was stating before Your Honor's question. What the Court says with the fact that the one screw, I believe, is missing according to everybody's testimony, I think that that tends me to then lean towards the side of concluding that it was a non-routine search under Molina-Terezan. But because the Court has satisfied clearly that in this case there was reasonable suspicion, the Court concludes that the motion should be denied. So it's up for grabs, I suppose. Nevertheless, Your Honor, and I appreciate you clarifying the record. In this case, what we have was a removal of the sending unit from the gas tank, as I stated earlier, an area of the car with gasoline in it, in an attempt to put the sending unit back in the gas tank, an attempt which ultimately failed to be done properly because, as Inspector Hood, who did the removal, testified, he was in a hurry. And I think it's also illustrated that, unlike Molina-Terezan, where the individual who was inspecting the gas tank, taking it down, removing the sending unit, was a certified mechanic, in this case we have a customs inspector with no formal training in the area of removing sending units from gas tanks. And by his own testimony, he did not get the screws back in place properly because he was in a hurry. For those reasons, Your Honor, I think what we have here is not only a search that uses force, but a search that causes a risk of danger. In addition to that, it's the kind of search, I think, that a reasonable driver, if they knew that a customs inspector without formal training was removing a sending unit out of their car, putting it back in and not doing it properly, would feel apprehensive about getting back in their car. Is this actually part of the gas tank? That's correct, Your Honor. It sits in the gas tank, as the testimony of Inspector Hood states. A sending unit is a mechanical apparatus that has a number of different functions. As Inspector Hood testified, it sends electrical signals to tell you, to the monitors in the front dashboard of your car, to tell you when you're low on gas and when you're not. In addition to that, it has many other functions. I don't think a car could run without the sending unit in it. How big of a unit are we talking about? Your Honor, I know from personal experience, having a case where the sending unit was actually brought into the court, it's about this big, and it moves up and down. It also has a little lever, I think it's like a little ball, that judges how much gas is left in the car. Once the sending unit is removed, how large is the aperture? How large is the opening to the gas tank? Because these inspectors peered into the gas tank so that they could then see the packages floating. That's correct. There were pictures admitted into evidence, and I can submit those to the court, of the sending unit, but it's about this big, Your Honor. I think six inches, I think, is what the record said. That's correct. Now, at that point, how far below that opening is the gas? I think, well, if the tank is full, then we're right on the brim. So if somebody were to drop an ash or to drop screws in there, it would be right into the gas tank? It would be disaster, Your Honor, yes, potentially disaster. And that's exactly what the Molina-Terrazon court was concerned about. As my colleague said several times, footnote seven of that case, the risk of danger may not come to fruition in every case. The question is, could it come to fruition in a case if this type of procedure, this type of non-routine search is done over and over again? Was there any evidence that the reinstallation of the sending unit could be mishandled in such a way so that it gave an improper reading on the amount of the gas left in the tank? There was no testimony by Inspector Hood that such a thing could happen, but I think it's something that is a reasonable inference because it does send signals. If it is done improperly, not only could one cause a fireball, an explosion, but one could also be stranded in the middle of nowhere in their Nissan Pathfinder, which is an off-road vehicle, thinking they have half a tank of gas left, when really they have no gas left. For those reasons, I think what we do have here as a matter of law under Molina-Terrazon is a non-routine search just under the three factors that the Molina-Terrazon discussed. You're coming up on your time, and let's assume we know the factors under Molina-Terrazon. I'd like to hear you address a bit on the reasonable suspicion. Thank you, Your Honor. Because this was a non-routine search, the government needs to prove that there was reasonable suspicion to support it. In this case, they rely on two separate factors. One is the dog search, which alerted to the presence of narcotics. The second was the tapping. To begin with the narcotics detector dog, the government provided absolutely no evidence that this dog was reliable. Defense counsel requested in her pretrial motions information on the reliability of the dog. She also requested an evidentiary hearing on the reliability of the dog. At the evidentiary hearing on whether it was a non-routine or routine search, defense counsel asked cross-examining Inspector Mora on the success and failure rate, the data on the narcotics detector dog, and the court, on objection by the government, sustained the objection on 403 grounds. So we were never even allowed on our own basis, even though it's the government's job to prove the dog is reliable, that this dog was unreliable. So there's no evidence in the record that it was reliable. And the case law bears out that that was a mistake or an error on the part of the district court not to allow it. If the government held to the same standard on proving the reliability of the dog if we were looking for reasonable suspicion as opposed to probable cause? I think it is. And I think you're referring to the case of the United States V. Lingenfelter, which said, you know, you can consider an alert by a narcotics detector dog in a probable cause analysis if the dog is proven reliable. And I think the same analysis applies in a reasonable suspicion analysis. The Fifth Circuit has said so in the case I cited, Horton v. Goose Creek Independent School District. They likewise said you can consider an alert by a narcotics detector dog in a reasonable suspicion analysis if the reliability is proven. And the reason that court said that was because what if a dog alerts 100 times to narcotics in a gas tank? But 95 out of the times, you take down the tank, you open it up, you look in, and there's nothing in there. What does that tell you? We have a very intrusive search based on a dog that really isn't that reliable. This case, this Court's holding in Sedano-Ariano backs up the Fifth Circuit's ruling. It said in Sedano-Ariano the discovery on the dog was crucial, I quote, crucial to the defense's ability to assess the dog's reliability. But we did have some evidence in the record from the inspector about how Spencer alerted. The inspector or the dog handler testified his dog was reliable. When asked how he knew his dog was reliable, he stated, because I trust him. I think that is hardly evidence to prove up that a dog is indeed reliable. What kind of evidence would the government have to provide? Training records. In Lindenfelter, the dog, I think they brought in an affidavit testifying to the fact that the dog had over 300 training exercises. And I don't want to misquote the case, but I believe they said he never failed. That proves up the reliability of the dog. If you have records, a sworn affidavit similar to testimony, that this dog almost never fails. Why isn't tapping on the gas tank in this case sufficient? Thank you, Your Honor. Similar to the dog alert, there was no testimony that the tapping in this case was reliable. The government failed to provide any empirical data. The government failed to provide any tests or any failure and success rates on the part of the inspectors. So it's similar in the – You're saying that tapping fails in this case because there's no foundation for it as a – As a – As a device. Yes. As a reliable device, Your Honor. This amounts to, at this point, junk science in that we don't know if, likewise with the dog, if Inspector Hood taps 100 tanks, whether or not 95 out of the times they drop that tank, pull out the standing unit, disengage the hoses, that there is no contraband in there. And we do have a case that was just pending before the district court on appeal where an inspector said, I'm wrong 90 percent of the time. And as soon as I have the transcripts from that case, I'd be happy to submit it to Your Honors. U.S. v. Marquez in the district court level right now. And that's not surprising, Your Honors, because gas tanks come to the border in all shapes and sizes. Some are made of different kinds of metal. Some are made of plastic. Some are – Can the inspector testify about that and say when you knock on – when you knock on it and there's nothing in it, you hear an echo and you feel the echo of nothing being in it? Well – If it has objects that aren't liquid, like a solid object, when you tap on it, it sounds like you're tapping on concrete as opposed to an empty can. Yes, Your Honor. But we also know that a gas tank is never empty. There are always solid objects in it. We know that a sending unit that is six inches in diameter and hangs in the tank is always there. There are also gas tank hoses leading from the sending unit to the engine. So depending on where an agent taps, he may be subjectively hearing solid and he may even be correct. He may be incorrect, but he may be correct. But what he may be hearing, Your Honors, is what he's tapping on being the sending unit. Of course, all we have to find is reasonable suspicion. That is correct, Your Honor. And when you look at reasonable suspicion, you need to look at the totality of the circumstances. In this case, I think not only do we have indication that the government failed to prove the reliability of the tapping on the dog, that the dog was also – there's evidence that the dog was not reliable. The inspector, the dog handler testified, one, that the dog sometimes alerts when there isn't any contraband there. He also testified that the dog requires praise and encouragement. Finally, I think looking at the totality of circumstances, there were several factors that indicated innocent behavior. There was no tool marks or evidence of tampering with the tank as we've seen so many times in other cases. I don't think we need the whole recitation of what's in your brief. You've gone beyond. I do have one other question that is not argued in the briefs. I understand from the record that Mr. De La Mora is not a U.S. citizen. Is that correct? That is correct, Your Honor. What is his status? At this time, I think he had a resident status. Was he lawfully in the United States? I believe he was lawfully in the United States. I don't want to misinform the Court. My understanding was he was lawfully in the United States, but when somebody is convicted of such a crime, they lose their lawful status as a result of that conviction. But did he have a prior conviction? No, I think this was Mr. De La Mora Vita's first conviction. At the time that he was crossing into the United States, he was lawfully entering the United States. My understanding was, and I don't think he had any prior convictions if I remember correctly, I may be incorrect, but I think he was safety valve eligible, meaning he didn't have any prior convictions. Thank you, Your Honor. I'll give you a minute on rebuttal. Thank you. Good morning, Your Honors. May it please the Court. Patrick O'Toole on behalf of the United States. Your Honors, if I might, there were a lot of questions, and I'm no mechanic, but the pictures of the sending unit and the access plate are set forth in the government's supplemental excerpts of record, anticipating that that might be some questions. I have three copies made, if I might approach the clerk. Sure. And I do note that the copy with the holes shows it a little bit better than the other copies, and I apologize for that. But it is part of the record and is in the government's supplemental excerpts. Your Honor, and I think it's very important because we have a situation, of course, where we're talking about a border search of property. And I think under the Montoya de Hernandez case, the distinction that was originally drawn between routine and non-routine, the strong suggestion by the Supreme Court in Montoya de Hernandez was that that was a distinction that only applied to property. Now, this panel, of course, is bound by the Molina-Terezon decision. The government accepts that that is a decision binding this panel relative to a particular kind of a search. But the particular kind of search that Molina-Terezon deals with is a gas tank search, but not just any gas tank search. It's a gas tank where the gas tank is dismantled, taken apart, and then reassembled, which has unique dangers attendant to that. That's not the kind of case that we have here. Well, it is a gas tank. It is a gas tank. And it isn't accessing the – it's exposing the fuel to the cargo compartment when you take it off. What I'd like to do is to address what happened in Molina-Terezon and what happened as far as the search here. I think we're familiar with the case. But, you know, the question is, in this case, applying the construct that Judge Kaczynski was careful to lay out, which is to run through this on a case-by-case basis, how do you address the facts of this case? There is gas involved. Why isn't that the same problem you have in Molina-Terezon when you're dealing with fuel? Now, the question is, you're saying, well, it's in different physical context. That's true. But we're looking at the pictures, and, you know, you've got the gas physically, the flammable fuel, physically exposed into the cargo compartment. Because there's no particular grave danger in the search that took place here versus the search in Molina-Terezon. Molina-Terezon, the vehicle was hoisted onto a truck. They loosened the straps holding the tank to the chassis. They disconnected the sending hoses and the filler. They detached the electrical connections. They disengaged the fill neck and unscrewed the bolts. They detached the tank itself, and they disengaged the hoses, and they removed the sensing unit. Mr. O'Toole, you don't dispute that in that case that that is not a routine search? Well, I actually would like to dispute it, but I do not dispute the fact that the government is bound by Molina-Terezon and that this panel is bound by Molina-Terezon. I would note, only for the timing perhaps of when these decisions are decided, that the government has filed a cert petition before the Supreme Court in a case called Manuel Flores, and that is pending in the Supreme Court. Now, the Supreme Court hasn't decided yet whether it's going to take it. We will know that probably in October, but there has been a cert petition on this very issue authorized by the Solicitor General on that given issue. But on Manuel Flores, that's not what was done in Manuel Flores. Same thing as Molina-Terezon, same exact kind of search. In fact, Manuel Flores is a test case, frankly, testing the parameters and whether Molina-Terezon was correctly decided. But, again, this panel, as we're here today, the government is- We're fully aware of what we're bound by, so we understand that. It's nice to know that there's stuff floating around and that Ted Olson thinks we should be having a look at it. And that's fine. Okay, but right now we're dealing with what we've got. That's right. Now, is this, Manuel Flores, is that a Ninth Circuit case? Yes, Your Honor. This is an intrusion into the gas tank, is it not, with the unit? In this case right here, it sits right into the gas tank. So if you take that unit out, you're looking right into the gas tank. Yes, that's absolutely the case. And so if somebody puts that back in correctly, it's possible for gas to slosh out into the passenger compartment. Right or wrong? No, I don't think so. But the important part is I just read eight different things that happened in Molina-Terezon as far as that search, including you had the sending unit removed. All right? I think that persuades us that Molina-Terezon was a very bad case. Now, the question is how bad is it when we're removing the sending unit in this case? We're exposing a gas tank. The customs officials do not get it put back on correctly. When Mr. de la Mora drives away, he drives away a different vehicle than he drove into the customs inspection statement. That's not correct. That's not correct? That's not correct. Did they get all the screws back in in the right place? One screw that they apparently could not put back in. Right. Why does the manufacturer put four screws in? Well, it's unclear as to whether the screw had rusted out. Why does the manufacturer, when it builds a vehicle, put four screws in? Because they want four screws to go back in. Right. I'm not disputing that. But what I'm disputing is in this particular case, we have an access plate which Your Honors have a picture of. You have an access plate that is simply unscrewed. And we don't know, and as a matter of fact, I believe in the appellant's brief, the statement is that the screw went to the access plate, not to the sending unit. But all you have is you have an access plate that is unscrewed, and the access plate is moved off. Then you have the sending unit, and Your Honors have the picture of that. We have he unscrewed the sending unit cover. He pulled it aside, and he could see inside the gas tank. We don't even have a removal of the sending unit. In other words, all you have, and you can take a look at the pictures, is the sending unit is unscrewed. You have it sitting there. It's moved out of the way temporarily, not removed, not disengaged, not disattached. All it is is moved out of the way, and they could see through the opening the marijuana packages. Now, I don't think that the gas tank is sacrosanct. In other words, Molina-Tarrazan spoke about grave danger because if it wasn't reattached properly, the gas tank could fall off, because if the hoses weren't engaged properly, you could have something that could lead to basically an explosion and destruction. That's not the kind of case that we have here. Mr. O'Toole, what happens if we don't get the cover plate put back on correctly? What happens if we have four rusty screws that were perfectly good? They sort of rusted in place. It's perfectly secure coming into the inspection station. Coming out of the inspection station, we now have the rug has been replaced in the back of the Pathfinder, and Mr. De La Mora or whoever is driving this car has no idea whether the car has been put back together correctly. Well, we know what happened because in this particular case, and that's the beauty of this case versus many other cases that we have, this is a vehicle that was driven off. It was driven off for 50 miles. We don't have anything that happened at all. We have the sending unit. The sending unit was put back, and it was re-screwed, and the access plate was re-screwed. We're missing one screw. Now, missing one screw does not all of a sudden move this case from the standard, routine search of property at the border to a non-routine search. That's what you'd like us to conclude, but the point of Tarazan is that we don't look just at the event of the particular case, but whether what is being the nature of the intrusion is sufficiently severe, and we look at the factors articulated there. Absolutely. And the danger, you're saying, well, we know what happened in this case. All right, fine, but just with the Buster case we're talking about, the government says, look, this is important to us to be able to do this. It's a border search situation. We're in post-9-11. We all know that, but the question is we have circuit authority that says if you are going to engage in levels of intrusion that may pose a risk of danger, whether in this case or not, whether the procedure does, and whether it creates a fear and apprehension on the part of the person involved, and if there's force, then we're supposed to apply those standards. So what we have in this case is gasoline, which is at least arguably flammable and volatile under certain circumstances. You have physical force to remove the screws. You can debate whether that's the kind of physical force that ought to be enough. We understand that. And then you have, in this case, a reassembly that isn't completely correct. It didn't restore it to the original condition. And thus I was not being facetious when I say why does the manufacturer put four screws in it? Maybe it's overcompensating, but maybe it believes that for this unit to be perfectly secure requires four screws. What if it were two screws? A screw that holds an access plate in is sufficient. That may be, but what happens if it's loose? What happens if dirt gets into the gas tank? What if this sending unit is put back in such a fashion it produces a false reading on the gas gauge? What if the guy does run out of gas in the middle of the desert after he leaves the border because he's got a false reading? I mean, if you were the manufacturer, you would wind up in court on a products liability case saying, you know, the fact is that you didn't put enough screws into this cover plate. Look what happened. And you'd have to defend whether or not what you did was reasonably foreseeable and so on and so forth. So the question we have here is, are you saying that this is so minimal in terms of danger that there's just nothing here we should worry about and that under all circumstances, moving into the gas tank through this methodology is just simply a routine search? I think that Molina-Terrazon was decided the way it was because of the majority's view as to the great danger involved with all of the things that happened with the gas tank. I argue Molina-Terrazon. I accept the decision. And we are where we are. But I don't think Molina-Terrazon should be extended to this court holding the gas tank is sacrosanct and if all we have is an access plate that is unscrewed and then we have a sending unit that is unscrewed for purposes of simply edging it out of the way so that you can look inside the gas tank, which is what happened here. We don't have it removed. We just have it unscrewed so that they can move it out of the way. It is screwed back. The access plate is screwed back. And then apparently one screw of the access plate does not come in. I do not think that that is sufficient to extend Molina-Terrazon to a one screw missing rule. Is that going to apply just to a gas tank? Is that going to apply in any other area of a vehicle that is searched? And that is what we have here. And that's why the district court even, in fact, Your Honor started it off, the district court said at ER 169, I think that just taking the screwdriver and removing it and observing it is actually quite routine. The reason that Judge Huff vacillated on whether it was ultimately a routine or non-routine search was two reasons. I think it's probably both sides could argue this. It would be interesting to see how the appellate court sees it because there were no facts relative to dismantling hoses. There's no removal of the gas tank. There's all that indicia. But nevertheless, they decided to put it back together and then do a controlled delivery. The reason that Judge Huff said that this may tend toward non-routine was for two reasons. One, we're missing the one screw. But the first fact that she listed was that this was a controlled delivery, meaning that they let the vehicle go at the border. We don't do that many of those. But that's not anything relative to a legal standard on routine or non-routine. So I just don't think, I understand Molina-Terrazon, I accept it. But I do not think that it should be extended. It should be limited to a case involving demonstrable grave danger. We don't have this in this case. We know that there wasn't any particular danger. The vehicle drove 50 miles without any problem whatsoever. I fail to see how there could be any grave danger. I mean, we can hypothesize, I guess, all we want. But there's no evidence of any grave danger or of any, frankly, any average danger under the facts of this given case. Mr. Field, though, if this is a routine search, that means it could be performed on every car coming through the border. That's right. Every car that comes across the border, the government could remove the access plate cover with four screws, and it could remove the screws for the sending unit and just edge it aside to look into it. Yes, I believe that that. That's the implication of finding that it is a routine search is that we can do it. We don't have to have dogs. We don't have to tap. We don't have to do anything. If you're driving across the border, then we can dismantle your sending unit. Well, again, I don't know. Take the access plate off and expose the sending unit.  And I'm not quibbling. I think dismantling, disconnecting, taking apart is different. I'm the most unmechanical guy in the world, but I think I could unscrew something and put it. Remember, the facts are in this case that this can be done on any, which means unscrew, expose, move aside. Edge aside, move aside. Actually, they did more than look, didn't they? Actually, did they pull out a package? No, not at that point. All they did was they saw the packages floating. They assumed it was marijuana. They screwed it back, screwed the access plate back, and let the car leave the vehicle, leave the border. But the reason why that's important is not because the government wants to unscrew access plates and look in the gas tanks, but gas tanks are the single most common method of smuggling drugs across the border. Approximately 25% of all the vehicle cases involving drugs at the border, and that's part of the record in Manual Flores-Montano, involve gas tanks. And what ended up happening in Molina-Terrazone and why the case was so important and shouldn't be extended, although this panel is bound by it, we end up having a rule that the one area of a vehicle that is most often used to smuggle drugs, 25% of all the vehicle seizures at our ports of entry involve gas tanks, is the one area of the vehicle that reasonable suspicion is required. And that is why it's so fundamentally important. And, of course, this panel can't revisit Molina-Terrazone. I'm not asking for that. But this panel can decide not to extend Molina-Terrazone to a gas tank search where there's not the dismantling, there's not the disconnecting of the hoses, there's not the dropping of the tank, there's not all the dangers that you have. I think we have the argument. We're well into it. I'd like to ask one more question. It's a question I asked Mr. Barth. Mr. de la Mora is not a citizen of the United States. Does the government contend that the Fourth Amendment did not apply to Mr. de la Mora? No, Your Honor. While I wasn't trial counsel below, I believe that he was a lawful resident. And I'm not arguing that because of his status, and it wasn't an illegal status, but I'm not arguing because of his status that the Fourth Amendment applied to him in a different way than it would to a citizen. Thank you very much. Thank you. This is the Court's intelligence. To begin with, Your Honor, I'd like to address some of the factual issues, one being read very briefly, Your Honor, one that I think government counsel tried to say that the Senate was just kind of edged aside. As you can see, it fills this hole here. I think, as Inspector Hood said, I had to pull it up out of the way. So I think it wasn't simply pushing like a sponge. This is a plastic or metal manual object that's in the tank. You can't simply push it aside. It needs to be lifted up out so you can look into the hole here. You can see the hole. It's about six inches in diameter. Finally, I'd just like to address his arguments regarding non-routine versus routine. It appears government counsel is really trying to limit the holding of Molina Terrazon to the specific facts of Molina Terrazon. And I don't believe you can do that. I think we understand the methodology. The government's entitled to argue to constrain, and you're entitled to argue that it should be extended. This is a different factual case, obviously. It is, Your Honor. Finally, I'd just simply like to say the government argued that the gas tank is not sacrosanct. And I think it's true. The gas tank is not sacrosanct. What it is, though, when it is searched is a non-routine search. It is not sacrosanct because all the government or the agents need is reasonable suspicion to search it. With that, I would submit and thank Your Honor. Thank you. I thank counsel for the argument. The case argued will be submitted, and we will take a brief 10-minute recess. All rise. This court will stand at recess for approximately 10 minutes.
judges: Fisher, Bybee, Mahan